UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| FRANCISCO JAVIER GONZALEZ GARCIA § § § | |
| v. § | CIVIL NO. 4:21-CV-650-SDJ |
| § | |
| MADONNA NASSER ADEEB RAMSIS § § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court in this Hague Convention case is Petitioner Francisco Javier Gonzalez Garcia's Verified Complaint and Petition for Return of Child to Spain and Issuance of Show Cause Order, (Dkt. #1), in which Garcia seeks the return of his child, S.J.G., to Spain. On January 14, 2022, the Court held a consolidated show cause hearing and bench trial at which Garcia and Respondent Madonna Nasser Adeeb Ramsis appeared and presented arguments concerning the propriety of S.J.G.'s return to Spain. (Dkt. #10). After considering the parties' arguments, the record, and the relevant law, the Court **GRANTS** Garcia's Petition for Return of Child to Spain and **ORDERS** S.J.G.'s return to Spain.

### I. BACKGROUND

Garcia is a citizen of Spain and has a Spanish passport and identity card. (Dkt. #11 at 11, 13). Ramsis is a citizen of Egypt and has an Egyptian passport. (Dkt. #11 at 15). She also has an expired United States B1/B2 visa, which was issued in 2016 and remained valid until July 25, 2021. (Dkt. #11 at 21). Garcia and Ramsis previously were in a relationship but have never been married. They have one daughter, S.J.G., together. S.J.G. was born in 2018 in New York. S.J.G. is a dual

1

citizen of the United States and Spain. She has a Spanish passport and Spanish Social Security number. (Dkt. #11 at 17, 19). Garcia is S.J.G.'s biological father and is listed as S.J.G.'s father on her American and Spanish birth certificates. (Dkt. #11 at 5, 8–9). Less than three weeks after S.J.G. was born, Garcia, Ramsis, and S.J.G. relocated to Egypt as a result of Garcia's employment. At the time, Garcia was employed as the financial director of a Spanish company. (Dkt. #11 at 90). The family lived in Egypt for approximately one year and four months. In May 2019, Garcia's employer transferred him to Spain. As a result, Garcia, Ramsis, and S.J.G. moved to Málaga, Spain, where they lived together for approximately ten months. Garcia and Ramsis did not maintain a residence in Egypt when they moved to Spain.

In March 2020, Garcia traveled from Spain to Mexico because his employer assigned him to a temporary position in the country. According to Garcia, his "intent was to work in Mexico temporarily and remain a resident of Spain." (Dkt. #1 ¶ 16). Garcia testified that he was scheduled to return to Spain at the end of 2020, and he signed a lease for a residence in Seville on January 1, 2021. (Dkt. #11 at 68). Ramsis and S.J.G. remained in Spain for an indeterminate amount of time after Garcia left. At some point, Ramsis and S.J.G. traveled to Egypt and then flew to Mexico to visit Garcia. After spending three months in Mexico, Ramsis left with S.J.G. Ramsis and S.J.G. were to fly first to New York and then on to Cairo, Egypt, to visit family. But once they landed in New York, Ramsis stayed in the United States with S.J.G., and the two did not board their flight to Egypt. Garcia sent text messages to Ramsis, asking her not to stay in the United States with S.J.G., but Ramsis refused to leave.

(Dkt. #11 at 26–29). Ramsis and S.J.G. currently reside in Plano, Texas, and Ramsis has applied for asylum.

Garcia sought assistance with returning S.J.G. to Spain. In an effort to resolve the matter, the United States Department of State contacted Ramsis in early 2021. (Dkt. #11 at 23–24). Ramsis did not respond. Less than a year after Ramsis took S.J.G. to the United States, Garcia filed his Verified Complaint and Petition for Return of Child to Spain and Issuance of Show Cause Order, (Dkt. #1), in this Court.

The Court held a show cause hearing and bench trial on Garcia's petition. Garcia and Ramsis both testified, and neither called additional witnesses. Garcia, through counsel, questioned Ramsis, and Ramsis questioned Garcia herself.

## II. LEGAL STANDARDS

The Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 ("Hague Convention"), governs civil proceedings filed in signatory countries for the recovery of abducted children. The United States and Spain are signatories to the Convention. The International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001–11, implements the Hague Convention in American law. *Abbott v. Abbott*, 560 U.S. 1, 9, 130 S.Ct. 1983, 176 L.Ed.2d 789 (2010). The Hague Convention and ICARA empower courts to order the return of children removed or retained in violation of the Hague Convention. *See* 22 U.S.C. § 9001(b)(4); *Abbott*, 560 U.S. at 9. However, neither the Hague Convention nor ICARA authorizes courts to determine the merits of the underlying custody dispute. *See* 22 U.S.C. § 9001(b)(4). Instead, the court's inquiry is limited to determining whether the child has been wrongfully removed from their country of

"habitual residence." *See Smith v. Smith*, 976 F.3d 558, 561–62 (5th Cir. 2020) (citation omitted). If the child has been wrongfully removed, the court must order the child's return, unless certain exceptions apply. *Abbott*, 560 U.S. at 9. "It is then up to the courts of the 'habitual residence' to decide the substantive merits of the underlying custody issue." *Smith*, 976 F.3d at 562 (citation omitted).

The removal or retention of a child is wrongful if the petitioner proves by a preponderance of the evidence that: (1) the respondent removed or retained the child somewhere other than the child's habitual residence; (2) the removal or retention was in breach of the petitioner's rights of custody under the laws of the country of habitual residence; and (3) the petitioner was exercising those custody rights at the time of removal or retention or would have exercised those rights but for the removal or retention. *Delgado v. Osuna*, 837 F.3d 571, 577 (5th Cir. 2016). "A threshold inquiry in a Hague [Convention] action is: what country was the child's habitual residence immediately before the alleged wrongful removal or retention." *Saldivar v. Rodela*, 879 F.Supp.2d 610, 618 (W.D. Tex. 2012). Recently, the Supreme Court clarified that "the determination of habitual residence does not turn on the existence of an actual agreement" between the parents. *Monasky v. Taglieri*, 140 S.Ct. 719, 726, 206 L.Ed.2d 9 (2020). The Court held that "[t]here are no categorical requirements for establishing a child's habitual residence." *Id.* at 728. Adopting the *Monasky* holding, the Fifth Circuit has instructed district courts to determine a child's habitual residence by "examin[ing] the totality of the circumstances." *Smith*, 976 F.3d at 561 (citing *Monasky*, 140 S.Ct. at 730).

4

Respondents in Hague Convention cases may assert several narrow affirmative defenses. *Soto v. Contreras*, 880 F.3d 706, 710 (5th Cir. 2018) (citing 22 U.S.C. § 9003(e)(2); Hague Convention, arts. 12, 13, 20). One available affirmative defense is that there is a grave risk that the child's return "would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Id.* (quoting Hague Convention, art. 13(b)). The respondent must prove the grave-risk defense by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A). To be clear and convincing, evidence must "produce[] in the mind of the trier of fact a firm belief . . . so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of precise facts of the case." *Waste Mgmt. of Wash., Inc. v. Kattler*, 776 F.3d 336, 341 (5th Cir. 2015) (quoting *Hornbeck Offshore Servs., L.L.C. v. Salazar*, 713 F.3d 787, 792 (5th Cir. 2013)). "[F]indings of grave risk are rare." *Soto*, 880 F.3d at 710 (alteration in original) (citation omitted).

To establish grave risk, "[t]he alleged harm 'must be a great deal more than minimal' and 'greater than would normally be expected on taking a child away from one parent and passing [the child] to another.'" *Madrigal v. Tellez*, 848 F.3d 669, 676 (5th Cir. 2017) (quoting *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000)). The principles underlying the Hague Convention require that the grave-risk exception "be narrowly construed; otherwise, a broad interpretation would cause the exception to swallow the rule and transform the Convention into an arena for custody disputes."

5

*Soto*, 880 F.3d at 710–11 (quoting *Tavarez v. Jarrett*, 252 F.Supp.3d 629, 640 (S.D. Tex. 2017)).

Whether allegations of spousal abuse can support a grave-risk finding is less settled. *See Gallegos v. Garcia Soto*, No. 1:20-CV092-RP, 2020 WL 2086554, at *3 (W.D. Tex. Apr. 30, 2020). The Fifth Circuit has noted that "sustained spousal abuse can, in some instances, create [a grave] risk." *Soto*, 880 F.3d at 713. And it has cited with approval decisions by other courts of appeals finding grave risk in cases "involv[ing] substantial violence" and/or "concrete" threats of violence, often in the child's presence. *Madrigal*, 848 F.3d at 677. But the Fifth Circuit has rejected "a bright-line rule that allegations of spousal abuse create grave risk to a child" because such a rule "would circumvent the Hague Convention's principle that 'the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence.'" *Soto*, 880 F.3d at 713 (quoting *Abbott*, 560 U.S. at 20).

The Tenth Circuit's decision in *Gil-Leyva v. Leslie*, 780 F.App'x 580 (10th Cir. 2019), provides additional guidance on the issue of when spousal abuse might pose a grave risk to the child. In *Gil-Leyva*, the court distinguished between "[e]vidence of a 'clear and long history of spousal abuse,'" which "may suffice to show a propensity for child abuse," and evidence of "isolated incidents of abuse," which "generally demonstrate a risk of harm only to the spouse." *Id.* at 590 (citation omitted). The court concluded that "[a]t a minimum, the spouse must 'draw a connection' showing that the risk such abuse poses to [the spouse] 'constitute[s] a grave risk to the children.'"

6

*Id.* (second alteration in original) (quoting *Charalambous v. Charalambous*, 627 F.3d 462, 468 (1st Cir. 2010)). Like at least one other district court in the Fifth Circuit, this Court "adopts the *Gil-Leyva* standard in the absence of clear Fifth Circuit precedent to the contrary, finding that it is consistent with the current state of Fifth Circuit law in this area." *Gallegos*, 2020 WL 2086554, at *8.

### III. DISCUSSION

Garcia argues that Spain is S.J.G.'s habitual residence, Ramsis removed S.J.G. and is retaining her outside of Spain, the removal and retention of S.J.G. violated his custody rights under Spanish law, and he "was actually exercising his rights of custody" at the time of removal and would continue to exercise such rights but for Ramsis's removal and retention of S.J.G. (Dkt. #1 ¶ 30). Ramsis argues that the removal and retention were not wrongful and that, even if they were, returning S.J.G. would pose a grave risk of harm.

**A. Wrongful Removal and Retention**

Garcia has proved each of the three elements required to establish that S.J.G.'s removal and retention were wrongful.

Ramsis removed S.J.G. to and is retaining her in the United States, outside of Spain, S.J.G.'s habitual residence. Construing Ramsis's pleadings and arguments liberally,[1] the Court assumes that she is challenging whether Spain is S.J.G.'s habitual residence because she argues that she did not agree for S.J.G. to have Spanish citizenship and that Garcia constantly moved to different countries because

---

[1] *See, e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) ("A document filed *pro se* is to be liberally construed . . . ." (quotation omitted)).

7

of his job. It is unclear, however, whether Ramsis believes the United States or another country is S.J.G.'s habitual residence. Considering the totality of the circumstances, the Court finds that Garcia has met his burden to prove that Spain was S.J.G.'s habitual residence at the time of her removal.

"The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Monasky*, 140 S.Ct. at 726. Though S.J.G. was in Mexico immediately prior to her removal, she was only in the country on a temporary basis, and neither party contends that Mexico was S.J.G.'s habitual residence. Similarly, though S.J.G. spent a portion of her life in Egypt, neither Garcia nor Ramsis argues that Egypt was her habitual residence. Ramsis testified that she lacks rights in Egypt and was attacked in Egypt as recently as June 2020. She also stated in her Answer that Garcia had to lie about the couple being married because of Egyptian views on unmarried mothers. (Dkt. #4 at 1). Even though Ramsis and S.J.G. were supposed to travel to Egypt in late 2020, there is no evidence that Garcia and Ramsis intended to move there or stay there for a significant amount of time.

The evidence shows that, despite her brief sojourn in Mexico, S.J.G. was at home in Spain in November 2020. S.J.G. is a Spanish citizen, and Ramsis has produced no evidence—other than her own conclusory testimony—showing that Garcia tricked her into signing S.J.G.'s Spanish citizenship papers. Ramsis does not attack the authenticity of S.J.G.'s Spanish passport and Social Security number. Not only are both Garcia and S.J.G. Spanish citizens, but also the family resided in Spain together for ten months before Garcia left temporarily to work in Mexico, and S.J.G.

8

remained in Spain with Ramsis for some period of time after Garcia departed. Ten-plus months is a significant period of time for a two-year-old child. *See, e.g.*, *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995) (finding Australia to be child's habitual residence where child had resided there for "close to six months, a significant period of time for a four-year[-]old child"). Although Ramsis testified that her time in Spain was merely a visit and that she traveled back and forth between Spain and Egypt during this time, she produced no evidence supporting this assertion. And the remainder of the evidence supports the conclusion that the family was residing in Spain during this time.

There is also evidence that the family planned to continue living in Spain after their brief time in Mexico. Garcia testified that the family intended to return to Spain. Ramsis, on the other hand, testified that she was unaware of Garcia's plan for where the family would live after leaving Mexico. The evidence tends to support Garcia's testimony. Garcia signed a lease for a residence in Spain dated January 1, 2021.[2] (Dkt. #11 at 68). Based on Ramsis's text message to Garcia in which she asked him to send her winter clothes from Spain, it appears that the family left at least some personal belongings in Spain when they traveled to Mexico. *See* Dkt. #11 at 31; *see also Monasky*, 140 S.Ct. at 727 n.3 (noting that courts have considered "location of personal belongings" in determining a child's habitual residence (citation omitted)). Further, in a Spanish-language statement, Garcia indicated that the plan was for

---

[2] The term and other details of the lease are unclear, as Garcia only submitted the odd-numbered pages of the lease. It is still significant, however, that he signed a lease in Spain after his stay in Mexico.

9

Ramsis and S.J.G. to return to Spain after their planned trip from Mexico to Egypt. (Dkt. #11 at 93). Therefore, the evidence suggests that Garcia and Ramsis intended for the family to continue living in Spain for an indefinite period of time. *See Monasky*, 140 S.Ct. at 727 ("Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations.").

To the extent Ramsis intends to argue that the United States is S.J.G.'s habitual residence, there is no evidence supporting such a conclusion. S.J.G. only lived in New York for one month prior to Ramsis removing her there. Further, Ramsis admitted that she wanted S.J.G. to be born in the United States because she faced persecution in Egypt—not because she intended to raise S.J.G. in the United States. *See* (Dkt. #4 at 1). Garcia testified that he and Ramsis were not living in New York at the time of S.J.G.'s birth. Neither Ramsis nor Garcia is an American citizen, and Ramsis only began the process of seeking asylum in the United States after removing S.J.G. Ramsis cannot establish the United States as S.J.G.'s habitual residence by unilaterally removing her to the country, as the relevant time period for the habitual residence determination is the time "immediately before" removal or retention. Hague Convention, art. 3; *see also Monasky*, 140 S.Ct. at 726 ("The place where a child is at home, *at the time of removal or retention*, ranks as the child's habitual residence." (emphasis added)); *see also Rishmawy v. Vergara*, 540 F.Supp.3d 1246, 1276 (S.D. Ga. 2021) (finding that habitual residence was not changed where the

10

father unilaterally intended for the child to begin residing in the United States and the mother never agreed to that arrangement).

Having determined that Spain was S.J.G.'s habitual residence and, thus, that Spanish law applies, the Court takes judicial notice of Articles 108, 154, 156, 158, 159, and 160 of the Spanish Civil Code, applicable at the time of S.J.G's removal, and finds that S.J.G.'s removal and retention breached Garcia's rights of custody under Spanish law. *See* Hague Convention, art. 14 (permitting courts to take notice of the law of the child's country of habitual residence).

Under Spanish law, non-emancipated children are under the authority of their parents. C.C., art. 154. "A biological, unmarried parent has the same status under the Spanish Civil Code as a married parent or an adoptive parent." *Garcia v. Varona*, 806 F.Supp.2d 1299, 1310 (N.D. Ga. 2011) (citing C.C., art. 108). Spanish parental authority, or *patria potestad*, includes both duties and responsibilities listed in the Spanish Civil Code and the right to "make decisions regarding a child's education, well-being, protection, upbringing, and place of residence." *Id.* at 1311 (quoting *Moreno v. Martin*, No. 08-22432-CIV, 2008 WL 4716958, at *8 (S.D. Fla. Oct. 23, 2008)). The duties imposed by the Spanish Civil Code include looking after one's children, keeping the children in one's company, feeding and educating one's children, and providing them with a comprehensive upbringing. C.C., art. 154. Both parents exercise parental authority, unless a court determines that only one parent is to exercise parental authority or one parent agrees to the other parent's sole exercise of such authority. *Id.* art. 156; *see also Moreno*, 2008 WL 4716958, at *8.

11

Ramsis does not appear to dispute Garcia's custody rights, and the Court sees no basis for doing so. As S.J.G.'s biological father, Garcia has parental authority over S.J.G., and a Spanish court has never deprived Garcia of such authority. There also is no evidence that Garcia and Ramsis ever agreed to Ramsis's sole exercise of parental authority. Before Ramsis removed S.J.G. to the United States, Garcia was living with and providing for S.J.G. Accordingly, Garcia had custody rights under Spanish law, and those rights had not been legally altered or extinguished at the time of S.J.G.'s removal to and retention in the United States. And the evidence, including text messages between the parties, establishes that Garcia did not consent to Ramsis taking S.J.G. to the United States. *See* (Dkt. #11 at 26–34). Therefore, Ramsis's removal of S.J.G. breached Garcia's rights of parental authority and custody.

The evidence shows that Garcia not only had custody rights but also exercised those rights from the time S.J.G. was born until Ramsis removed her to the United States. Garcia provided a home for his daughter, lived with her for the majority of her life between her birth and her removal, and interacted with her. If "a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention *short of acts that constitute clear and unequivocal abandonment of the child.*" *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 345 (5th Cir. 2004) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996)). There is no evidence that Garcia abandoned S.J.G.; instead, Garcia produced evidence that he attempted to contact S.J.G., assisted with S.J.G.'s medical care, and provided food for S.J.G. even

after her removal to the United States. (Dkt. #11 at 30–34); (Dkt. #11-1 at 15, 17). And Ramsis does not contest that Garcia was exercising his custody rights at the time of S.J.G.'s removal. In fact, Ramsis produced videos showing that Garcia was interacting with and parenting S.J.G. as recently as November 2020.

For the foregoing reasons, the Court finds that Garcia has proved by a preponderance of the evidence that Ramsis wrongfully removed S.J.G. from Spain, S.J.G.'s habitual residence. Unless the grave-risk defense applies, S.J.G. must be returned to Spain.

**B. Grave Risk**

In her Answer, Ramsis alleges that Garcia "abused [Ramsis] and [S.J.G.] psychology [sic] and sexually." (Dkt. #4 at 1). Ramsis claims that Garcia abused her by screaming at her, threatening to kill her at least once, raping her twice, and talking about his connections with the Mafia. (Dkt. #4 at 1). At the hearing and bench trial, Ramsis testified to the existence, but not the details, of this abuse, and also testified that Garcia drugged her. Ramsis alleges that Garcia abused S.J.G. by watching horror movies with her when she was two years old, which gave her nightmares, and by "exploding at [Ramsis] with anger in front of" S.J.G. (Dkt. #4 at 1).

To corroborate her allegations, Ramsis introduced several videos into evidence at the hearing and bench trial. These videos generally showed Ramsis and Garcia arguing about their relationship and matters relating to their parenting of S.J.G. Ramsis also produced a photograph of herself with fairly extensive injuries to her face

13

and head; however, she testified that unidentified individuals in Egypt, not Garcia, caused these injuries. On cross-examination, Ramsis asked Garcia whether he had ever threatened to kill her or bragged about his ties to the Mexican Mafia. He denied both allegations.

Because Ramsis provided only the videos and her own conclusory and non-specific testimony regarding alleged abuse, with no other evidence supporting Garcia's alleged misconduct towards her or S.J.G., she cannot meet her burden to prove by clear and convincing evidence that returning S.J.G. to Spain would pose a grave risk to S.J.G. The only concrete example of alleged abuse toward S.J.G. that Ramsis provided is her contention that Garcia watched horror movies with S.J.G. and that S.J.G. experienced nightmares as a result. While Garcia's actions might arguably pose some risk to S.J.G., they do not, standing alone, pose more than a "serious" risk. *See Soto*, 880 F.3d at 710. There is no evidence that Garcia ever physically abused or threatened S.J.G., and Ramsis did not provide any specific examples of alleged psychological or emotional abuse.

The bulk of Ramsis's arguments instead deal with alleged threats made and harm done to Ramsis herself. If the Court takes as true all of Ramsis's testimony, and disbelieves Garcia's contradictory testimony, Ramsis likely has demonstrated "sustained spousal abuse." *Gallegos*, 2020 WL 2086554, at *7 (quoting *Soto*, 880 F.3d at 712–13). However, Ramsis has not adduced clear and convincing evidence connecting the risk posed to her "to the eminent possibility of a grave risk *to [S.J.G.]*." *Gallegos*, 2020 WL 2086554, at *8. As noted above, there is no evidence that Garcia

abused or was violent toward S.J.G. Ramsis did not testify to any particular incidents of spousal abuse that occurred in S.J.G.'s presence. Simply put, there is no evidence of "substantial violence," "concrete" threats, or any spousal abuse sufficiently connected to S.J.G. to support a finding that she would face grave harm if returned to Spain. *Madrigal*, 848 F.3d at 677 (collecting cases). Ramsis's allegations are best left for consideration by a Spanish court in the context of custody proceedings.

## IV. CONCLUSION

For the foregoing reasons, it is **ORDERED** that Garcia's Petition for Return of Child to Spain, (Dkt. #1), is **GRANTED**. S.J.G. is to be promptly and safely returned to Spain.

It is further **ORDERED** that within thirty days after S.J.G.'s return to Spain, Garcia may submit a motion for costs and fees, accompanied by a final list of his incurred expenses, including attorney's fees, court costs, and transportation costs related to the return of S.J.G. *See* 22 U.S.C. § 9007(b)(3). Should Garcia file such a motion, Ramsis may respond within fourteen days.

The clerk's office is directed to mail a copy of this order to Defendant Madonna Nasser Adeeb Ramsis by certified mail, return receipt requested, at the address provided in the Affidavit of Service, (Dkt. #3).

**So ORDERED and SIGNED this 31st day of January, 2022.**

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE